**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
CASE NO. _____ - CIV - _____

DOROTHY ANDERSON-CAHILL, AS
PERSONAL REPRESENTATIVE OF THE
ESTATE OF THOMAS J. CAHILL III
                Plaintiff,

  v.

BAYER CORPORATION D/B/A BAYER
USA; BAYER CROPSCIENCE LP; AND
MONSANTO COMPANY,

                Defendants.
_____/

## <u>COMPLAINT</u>

COMES NOW the Plaintiff, DOROTHY ANDERSON-CAHILL, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF THOMAS J. CAHILL III, (hereinafter "Plaintiff") by and through her undersigned counsel, and hereby sues Defendants, BAYER CORPORATION D/B/A BAYER USA; BAYER CROPSCIENCE LP; AND MONSANTO COMPANY (hereinafter collectively "Defendants"), and in support thereof, states as follows:

### PARTIES

1. This is an action for damages that exceeds SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00), exclusive of interest, costs, and attorney's fees.

2. Plaintiff, DOROTHY ANDERSON-CAHILL, is the Personal Representative of the Estate of THOMAS J. CAHILL III, the surviving spouse of THOMAS J. CAHILL III, an adult over the age of 21, and otherwise *sui juris*.

3.  Defendant, BAYER CORPORATION D/B/A BAYER USA (hereinafter "BAYER"), is, and at all times material hereto was, an Indiana for-profit corporation registered with the Florida Department of State (Document Number P15586) whose principal address is 100 Bayer Road, Building 4, Pittsburgh, PA 15205. BAYER is a subsidiary of BAYER AG of Germany and reported revenue of over $44 billion dollars in 2018.

4.  Defendant, BAYER CROPSCIENCE LP (hereinafter "BAYER CROP") is, and at all times material hereto was, a Delaware limited partnership registered with the Florida Department of State (Document Number B99000000458) whose principal address is 800 N. Lindbergh Blvd., St. Louis, MO 61367. BAYER CROP was launched in 2002 and is BAYER's first legally independent subgroup, with its Board of Directors being comprised of professionals hailing from a variety of U.S.-corporations, universities, and law firms.

5.  Defendant, MONSANTO COMPANY (hereinafter "MONSANTO") is, and at all times material hereto was, a Delaware for-profit corporation registered with the Florida Department of State (Document Number F00000005583) whose principal address is 800 N. Lindbergh Blvd., St. Louis, MO 61367. BAYER acquired the agricultural giant MONSANTO, as well as all of its product lines which include Roundup®, in a $66 billion dollar corporate acquisition ("Acquisition") on June 7, 2018[1]. As a result of this acquisition, BAYER is the sole shareholder of MONSANTO and effectively commands more than a quarter of the combined world market for seeds and pesticides in the fast-consolidating farm supplies industry.[2]  While committing the acts as set forth in this complaint, each and every managing agent, representative, and/or employee of BAYER

---

[1] https://monsanto.com/news-releases/bayer-closes-monsanto-acquisition/
[2] https://cnbc.com/2016/09/14/bayer-and-monsanto-agree-to-merge.html

and its subsidiaries was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of their respective directors, officers, and/or managing agents.

6. In addition to the Defendants set forth herein, there are likely other parties who may well be liable to Plaintiff, but respecting whom Plaintiff currently lacks specific facts to permit them to name such persons as Defendants.  By not naming such persons or entities at this time, Plaintiff is not waving their rights to amend this pleading to add such parties, should the facts warrant adding such parties.

## JURISDICTION, AND VENUE

7. This Court has federal diversity jurisdiction over this action pursuant to 28 U.S.C. §1332, as (a) the parties are completely diverse in citizenship and (b) the amount in controversy exceeds $75,000.00, exclusive of interest, costs and attorneys' fees.

8. This Court has personal jurisdiction over Defendants pursuant to Federal Rules of Civil Procedure 4(k)(1) and Fla. Stat. §48.193 as the Defendants:

   a. Operate, conduct, engage in and/or carry on a business or business venture in this state as reflected by the fact that:

      i. BAYER has been registered with the Florida Division of Corporations since 1987 and has continuously and systematically conducted business in the ordinary course of commerce in Florida for over thirty (30) years;

      ii. BAYER CROP SCIENCE has been registered with the Florida Division of Corporations since 1999 and has continuously and systematically conducted

business in the ordinary course of commerce in Florida for over twenty (20) years; and

    iii.   MONSANTO has been registered with the Florida Division of Corporations since 2000 and has continuously and systematically conducted business in the ordinary course of commerce in Florida for over twenty (20) years,

b.   Directly engaged in continuous and systematic business activites in Florida with the clear and reasonable expectation that large numbers of their goods will be purchased and utilized by consumers who shop at various retails stores selling the Defendants' products, including Roundup®;

c.   Has an office or agency in this state, reflected by the fact that the Defendants have registered agents on file with the Florida Division of Corporations via Corporation Service Company in Tallahassee, Florida;

d.   Engage in substantial and not isolated activity in Florida both in person and via telephone and/or their respective websites (www.bayer.com, www.cropscience.bayer.us, and www.monsanto.com).  Such activity is interstate, intrastate, and international, thus making it subject to the jurisdiction of Florida's courts, whether or not the claim arises from that activity;

e.   Sell Roundup® and other products in the State of Florida;

f.   Sell products and services to customers in Florida and said services are performed in Florida and regulated by state and local governments in Florida.  Such services include, but are not limited to, administering herbicidal treatments to commercial and residential properties;

g.  Realize the substantial benefit of conducting business in Florida, including, but not limited to, Florida's pro-business state tax policies, competitive cost of doing business, streamlined regulatory environment, and access to the nation's fourth largest workforce;

h.  Transport goods to and between its retailers, purveyors, vendors, and/or warehouses throughout Florida on public roads and railways using company or third party trucks, all of which are subject to regulation by the Florida Department of Transportation and Highway Safety and/or state/ local agencies, and governed by Florida state and local laws;

i.  Sell Roundup® and other products regulated by the Florida Department of Agriculture, Department of Environmental Protection, and/or other state and local agencies;

j.  Employ Florida residents and/or individuals who live in Florida to sell their merchandise and render services in Florida.  Said employment invoked the application of a number of Florida laws and the jurisdiction of Florida state and local government agencies regulating employment, the workplace, health, and safety.  These include, but may not be limited to: worker's compensation, unemployment / reemployment, workplace safety, discrimination, public accommodations, controlled substances, health care, zoning, building, and a host of other laws and regulations;

k.  Realize revenue and profit for people and business in Florida;

l.  Spend substantial sums in Florida to operate their business in Florida;

m. Own, use, possess, and/or hold a mortgage or other lien on real property within Florida (including but not limited to, property upon which their warehouses, distribution centers, and/or offices are located), or do so through a related and/or affiliated subsidiary or other such entity within the respective Defendant's exclusive and/or substantial control;

n. Have committed a tortious act(s) within Florida, whether as alleged herein or otherwise in the past in unrelated matters, but not limited to, assorted personal injury cases which have been pursued by third parties alleging they've incurred injuries using products manufactured by the Defendants and/or caused by their personnel at various times throughout the Defendants' years of operating in Florida;

o. Have contracted to insure a person, property, or risk location within Florida at the time of contracting, including by not limited to, insuring their retail locations, offices, warehouses, merchandise, vehicles, and/or employees;

p. Have breached a contract in Florida by failing to perform acts required by the contract to be performed in Florida, whether as alleged herein or otherwise in the past in unrelated matters; and/or

q. Regularly participate as a major sponsor(s) and/or exhibitor(s) in Florida state events, including B2B development, seminars, exhibitions, and events to attract new vendors, customers, suppliers, service providers, etc.

9. Venue of this action is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events giving rise to this claim occurred within this venue.

FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

A.     *Thomas J. Cahill III's Exposure to Glyphosate.*

10. THOMAS J. CAHILL III (hereinafter "Decedent") was employed in the irrigation and landscaping industry in Florida for several decades prior to his untimely death. Specifically, Decedent owned and operated AQUA-FLO SERVICES, INC. from June 1992 until his death in January 2019.  Prior to opening AQUA-FLO SERVICES, INC., Decedent worked as an employee for several large landscaping and irrigation companies.

11. Decedent was a loving husband, father, and grandfather.  His surviving wife, DOROTHY ANDERSON-CAHILL, was his closest friend and confidant for many years prior to his untimely death.  Decedent was also survived by four adult children, two of which worked as full-time employees for Decedent at his landscaping and irrigation business, AQUA-FLO SERVICES, INC.  Decedent was also survived by several grandchildren and two great-grandchildren, all of whom were very close and spent time regularly with the Decedent.

12. Decedent used Roundup® during the course of his entire career, and he was regularly exposed to Roundup® as this was the herbicide he used on customers' lawns and/or landscaping.

13. Decedent relied on the advertising and misinformation disbursed by Defendants that stated Roundup® was safe for humans to use to kill and control the growth of unwanted grass, weeks, and other unwanted greenery at jobsites.

14. In addition to using Roundup® at jobsites, the Decedent further relied on the advertising and misinformation from Defendants that Roundup® was safe to use and chose to treat his the landscaping and lawn of his own home and garden with the product.  Decedent was an

avid garden enthusiast and spent much of his free time ensuring that his landscaping and personal garden remained in beautiful condition.  Decedent utilized Roundup® as its intended

15. Decedent used Roundup® to spray lawns and/or landscaping five and six days per week.

B.      *Symptoms, diagnosis, and death.*

16. In late 2017, Decedent was diagnosed with a brain tumor.  The laboratory results from Decedent's blood work confirmed that he was specifically suffered from Non-Hodgkin Lymphoma.

17. Following extensive surgeries, as well as chemotherapy and radiation treatment, Decedent's condition continued to decline.

18. In January 2019, the Decedent succumbed to respiratory failure that was a direct symptom of the Non-Hodgkin Lymphoma.

19. Upon information and belief, Decedent's daily use of and contact with Roundup® in the workplace and in his personal gardening exposed Decedent to lethal doses of glyphosate.

20. Decedent's development of Non-Hodgkin Lymphoma was directly and proximately caused by his daily exposure Roundup®.

21. As a direct and proximate cause of his terminal diagnosis, Decedent spent the last two years of his life in constant pain, accruing significant medical expenses, experiencing the dramatic side-effects of chemotherapy and radiation, and ultimately suffocating to death.

22. As a direct and proximate cause of his terminal diagnosis, Decedent's condition prevented him from being able to work and care for himself and his family.  As such, Decedent became completely dependent upon his wife and his adult children for care, survival, management of his personal financial affairs, and management of his irrigation business.

C.    *Origins of Glyphosate.*

23. In 1970, MONSANTO discovered the herbicidal properties of a chemical known as "glyphosate."

24. It began marketing glyphosate in products in 1974 under the brand name Roundup®.

25. Roundup® is a non-selective herbicide used to kill weeks that commonly compete with actively growing crops.

26. MONSANTO retained exclusive rights of glyphosate in the US until its US patent expired in September 2000; the patent expired earlier in other countries.

27. The Roundup® trademark is registered with the US Patent Office.

28. By 2001, glyphosate had become the most-used ingredient in American agriculture, with an estimated 85 to 90 million pounds used annually.  That number great to 185 million pounds by 2007.

29. Today, glyphosate products like roundup remain the most widely used herbicide in the United States and worldwide[3], relied upon by farmers, landscapers, and homeowners.

30. MONSANTO's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.

31. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agriculture areas where Roundup® is used.  It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers that are not in direct contact with glyphosate.

32. MONSANTO is the world's leading producer of glyphosate.

---

[3] Reuters: Heavy Use of Herbicide Roundup Linked to Health Dangers – US Study:
https://reuters.com/article/roundup-health-study-idUSL2N0DC22F20130425

33. At all times relevant, MONSANTO was in the business of, and did design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and is responsible for the parties who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide.

34. Pursuant to the Acquisition, BAYER takes on responsibility for MONSANTO's actions.

D.    *Carcinogenic Effects of Glyphosate.*

35.  Consumers, farmers, and the public have used Roundup® for nearly 40 years, unaware of its carcinogenic properties.

36. Scientific reports indicate end-users of Roundup® are exposed to glyphosate when the herbicide comes into contact with their skin, or when it is inhaled.[4]

37. Community exposure to glyphosate is widespread and found in soil, air, surface, water, and groundwater, as well as food.[5]

38. The use of Roundup® has been repeatedly and scientifically linked to the human development of various cancers, including but not limited to Non-Hodgkin Lymphoma ("NHL") and various cancers of the lymphatic system.[6]

39. The World Health Organization ("WHO") has formally linked use of Roundup® - now the world's most popular herbicide – to development of various cancers and damage to chromosomes and DNA in humans.[7]

---

[4] https://brownandcrouppen.com/areas-of-practice/defective-products/roundup-non-hodgkin-lymphoma/
[5] IARC Monographs Volume 112: evaluation of five organophosphate insecticides and herbicides: https :// www.iarc.fr/wp-content/uploads/2018/07 /Monograph Volume 112-1.pdf
[6] http://naturalsociety.com/roundup-chemicals-linked-to-cancer-of-the-lymph-system
[7] https://www.reuters.com/article/us-monsanto-roundup-cancer-idUSKBNO MG 2NY2015 0320

40. The International Agency for Research on Cancer ("IARC"), an agency of the WHO, identified glyphosate exposure pathways to include air (especially during spraying), water, and food.

41. On July 29, 2015, IARC issued a formal monograph relating to the glyphosate.  In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure to humans.

42. IARC's evaluation was based, in part, on studies of exposure to glyphosate in several countries around the world, and traced the health implications from exposure to glyphosate since 2001.

43. The IARC Working Group classified glyphosate, the active ingredient in Roundup®, as a Group 2A herbicide, which means it is "probably carcinogenic to humans."

44. The IARC evaluation to highly significant, confirming what has been believed for years: glyphosate is toxic to humans.

45. The IARC Working Group concluded the cancers most associated with glyphosate exposure of NHL and other hematopoietic cancers, including the lymphocytic leukemia and multiple myeloma.

46. New scientific studies strong indicate people frequently exposed glyphosate face a 41 percent increased risk of developing cancer.[8]

47. A paper published in the *International Journal of Environmental Research and Public Health*, reflects studies in high-income countries found that there was a "striking increase" in the incidence of NHLs in the last 30 years.[9]

---

[8] https://www.naturalblaze.com/2019/02/ exposure-to-monsantos-roundup-increases-cancer-risk-by-41-anal ysis-shows.html
[9] https :/ /www.ncbi.nlm.nih.gov/pubmed/24762670

48. Five scientists at the University of Washington conducted the study analyzing all published data on glyphosate and its link to NHL from 2001 to 2018 – and are now "even more convinced" that the chemical is behind many cancer diagnoses.[10]  Scientific studies additional demonstrate that even exposure to Roundup® in low doses can cause cancer in major human organs. [11]

49. Among the pesticides studies, glyphosate exposure was found to be positively associated with a particular type of NHL, B cell lymphoma.[12]

50. The inactive ingredients in Roundup® have also been found to carcinogenic even in the parts per trillion range, so the study brings attention to the phenomenon which was already coming to light in the scientific community.

51. Roundup® is a defective, dangerous and lethal to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and direction as to the dangers associated with its use.

E.    *Defendants knowingly perpetrated MONSANTO's negligent actions.*

52. From the onset, MONSANTO knowingly, willfully and negligently manufactures and sold Roundup® in product packaging that is devoid of written safety warnings, thereby keeping consumers aware of Roundup®'s carcinogenic effects or the need to take protective measure when applying the product.

---

[10] https:/ /www.naturalblaze.com/2019 /02/ exposure-to-monsantos-roundup-increases-cancer-risk-by-41-anal ysis-shows.html
[11] https://sustainablepulse.com/2015/08/26/unique-roundup-study-shows-massive-kidney-and-liver-gene-function-alterations/
[12] http://naturalsociety.com/roundup-chemicals-linked-to-cancer-of-the-lymph-system/#ixzz5gCS4djg0

53. Pursuant to the Acquisition, BAYER could have corrected MONSANTO inadequacies in failing to adequately disclose Roundup®'s risks and the need to exercise safe handling measures.

54. Yes, Defendants knowingly, willfully, and negligently failed to do so.

55. Below is the relevant portion of the rear-facing packaging of Roundup®:



56. While Roundup®'s label cautions users "DO NOT allow container or spray to get into drains, sewers, streams, or ponds," and "DO NOT allow spray to contact or drift onto plants you do not want killed," the label is glaringly devoid of adequate ingredient or safety warnings to protect humans.

57. In fact, the label places priority on protecting the plaints it is deigned to kill rather than helping human handlers: "If sprayed, cut off leaves or wash with water immediately to avoid injury."  The caution is avoiding injury to *plants*.

58. The rear-facing label fails to provide any such guidelines regarding inadvertent human contact with Roundup® or warn of injuries which may result.  The rear-facing label fails to advise users to wear masks while spraying Roundup® in order to avoid inhaling the products deployed vapors and/or mists.

59. The best warning Defendants manage to muster on the Roundup® label amounts to offering little more than common sense: "Avoid contact with eyes.  Wash hands after use."

60. Despite numerous scientific findings from around the world demonstrating the highly-carcinogenic nature of Roundup® and its main active ingredient, glyphosate, Defendants knowingly and willfully failed to manufacture and design packaging bearing any warnings concerning the possibility and/or likelihood of developing cancer or other injuries through the use of Roundup® or even to exercise safe-handling measures as a precaution.

61. The Defendants knowingly and willfully failed to provide safety and health warnings to consumers concerning the use of Roundup®.

62. The Defendants knowingly and willfully failed to remove Roundup® from the marketplace or even warns of its risks.

63. The Defendants knowingly and willfully maintained a singular focus: earning billions of dollars in quarterly and annual profits from the sale of Roundup®.

64. Since MONSANTO began selling Roundup®, it has represented the product as safe to humans and the environment.  It repeatedly claimed, and the Defendants continue to proclaim to the world, and particularly United States consumers, that glyphosate-based herbicides, including Roundup®, pose no unreasonable risks to human health or to the environment.

65. The Defendants knowingly and willfully prioritized profits over the health and safety of millions of people around the world, including Decedent.

F.   *Registration of Herbicides under Federal Law*.

66. MONSANTO assured – and the Defendants continue to assure – the public that Roundup® is harmless.  In order to prove this claim, MONSANTO championed falsified data and attacked legitimate studies that revealed its dangers.

67. MONSANTO led a prolonged campaign of misinformation to convince government agencies, farmers, and the general public that Roundup® was safe.

68. By virtue of the Acquisition and failure to take any corrective actions, the Defendants have endorsed and perpetuated MONSANTO's bad acts.

69. The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. Section 136 *et seq.*

70. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act.  7 U.S.C. Section 136a(a).

71. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to humans and other potential non-target organisms, and the adverse effects on the environment.

72. Registration by the EPA, however, is not an assurance or finding of safety.  The determination the EPA must make in registering or re-registering a product is not that the

product is safe, but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."

73. FIFRA defines "unreasonable adverse effects on the environment" to mean "any reasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticides."  7 U.S.C. Section 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

74. MONSANTO first introduces Roundup® and registered it for distribution, sale, and manufacture in the United States.

75. FIFRA required a registrant to conduct the health and safety testing of its pesticide products.  The EPA has protocols in place, which govern the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation.  The Government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

76. The evaluation of each pesticide products distributed, sold, or manufactured is completed at the time the product is initially registered.  The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally mandated process called "re-registration."  7 U.S.C. 136(a-1).  In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of date for the EPA's review and evaluation.

77. In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

G.    *Scientific Fraud Underlying the Marketing and Sale of Glyphosate / Roundup®*

78. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985.

79. After receiving pressure from MONSANTO, including the release of contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity to humans (Group E) in 1991.

80. In so classifying glyphosate, however, the EPA mad clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that the designation of an agent in Group E is based on the available evidence at the time of the evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

81. On two occasions, the EPA found that the laboratories hired by Defendants to test the toxicity of its Roundup® products for registration purposefully committed fraud.

82. In the first instance, MONSANTO, in seeking initial registration for Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.  IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the fifteen residue studies needed to register Roundup®.

83. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicology impacts of glyphosate.

84. The EPA subsequently audited IBT and found the toxicology studies conducted for the Roundup® herbicide to be invalid.

85. An EPA reviewer stated, after finding routine falsification of data at IBT that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

86. Three top executed of IBT were convicted of fraud in 1983.

87. Regarding the second incident of data falsification, MONSANTO hired Craven Laboratories ("CRAVEN") in 1991 to perform pesticide and herbicide studies, including for Roundup®.  In that same year, the owner of CRAVEN and three of its employees were indicted and ultimately convicted of fraudulent laboratory practices in the testing of pesticides and herbicides.

88. Despite the falsity of the tests that underlie its registration, within a few years of its launch, MONSANTO was marketing and distributing Roundup® to more than 100 countries.

89. By virtue of the Acquisition and failure to take any corrective action, Defendants have endorsed and perpetuated MONSANTO's bad acts.

H.    *The Defendants Have Realized Huge Profits and Market Dominance from Roundup®*

90. The success of Roundup® was key to MONSANTO's continued reputation and dominance in the marketplace, and Roundup® remains a continuing success for the Defendants pursuant to the Acquisition.

91. Largely due to the success of Roundup® sales, MONSANTO's agricultural division was out-performing its chemicals division's operation income, and that gap increased yearly.

92. With its patent for glyphosate expiring in the United States in 2000, however, MONSANTO needed a strategy to maintain its Roundup® market dominance and ward off impending competition.

93. In an effort to maintain its market dominance, MONSANTO developed and marketed genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop.

94. The success of MONSANTO's Roundup Ready® seeds allowed MONSANTO to expand its market for Roundup® even further. By 2000, MONSANTO's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds.

95. It also secured MONSANTO's dominant share of the glyphosate / Roundup® market through marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicides.

96. Through a three-pronged strategy of increased production, depressed prices, and coupling its herbicides with Roundup Ready® seeds, Roundup® became MONSANTO's most profitable product.

97. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five-to-one and accounting for close to half of MONSANTO's annual revenue.

98. Today, glyphosate remains one of the world's largest herbicides by sales volume.

99. By virtue of the Acquisition and failure to take any corrective action, Defendants have endorsed and perpetuated MONSANTO's bad acts.

I.    *Monsanto has known for Decades that it Falsely Advertises the Safety of Roundup®*

100.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against MONSANTO based on its false and misleading advertising of Roundup® products.

101.    Specifically, the lawsuit challenged MONSANTO's general representation that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than salt" and "practically non-toxic" to mammals, birds, and fish.   Other representation from MONSANTO that that NYAG found deceptive and misleading[13] about the human an environmental safety of Roundup® included the following:

a.   Remember that environmentally friendly Roundup® herbicide is biodegradable.  It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks, and fences;

b.   And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problems;

c.   Roundup® biodegrades into naturally-occurring elements;

d.   Remember that versatile Roundup® herbicide stays where you put it.  That means there's no washing or leaching to harm customers' shrubs or desirable vegetation.

e.   This non-residual herbicide will not wash or leach into the soil.  It stays where you apply it;

---

[13] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law Section 63(15) (Nov. 1996).

f. You can apply Accord with "confidence because it will stay where you put it; it bonds tightly to the soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural product,";

g. Glyphosate is less toxic to rats than table salt following the acute oral ingestion;

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it;

i. You can feel good about herbicides by Monsanto. They carry a toxicity category of "practically non-toxic" as it pertains to mammals, birds, and fish; AND

j. Roundup® can used where kids and pets will play and break down into a natural material. (This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.)

102. On November 19, 1996, Monsanto entered into an "Assurance of Discontinuance" with NYAG, in which MONSANTO agreed, among other things, "…to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless, or free from risk;

b. Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed, or sold by Monsanto are biodegradable;

c. Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d.  Its glyphosate-containing pesticide products or any component thereof as "good" for the environment or are "known for their environmental characteristics.";

e.  Its glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; OR

f.  Its glyphosate-containing pesticide products or any component thereof might be classified as "practically" non-toxic.

103.    Monsanto did not alter its advertising in the manner described above in any state other than New York and has not yet done so today.

104.    In 2009, France's highest court rules that Monsanto had not told the truth about the safety of Roundup®.  The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[14]

105.    By virtue of the Acquisition and failure to take any corrective action, Defendants have endorsed and perpetuated MONSANTO's bad acts.

J.    *Classifications and Assessments of Glyphosate*

106.    The IARC process for the classification of glyphosate followed the stringent procedures of the evaluation of a chemical agent.

107.    Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B

---

[14]   Monsanto  Guilty  in  'False  Ad'  Row,  BBC  Oct.  15,  2009  available  at http:/news.bbc.co.uk/2/hi/Europe/8308903.st

(Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

108.      The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

109.      The IARC Working Group also found that glyphosate caused DNA and chromosomal damage to human cells.  Only one study in community residents reported increased in blood markers of chromosome damage (micronuclei) after glyphosate formulations were sprayed.

110.      In Made CD-1 mice, glyphosate induced a positive trend of incidences of rare tumors, renal tubule carcinoma.  A second study reported a positive trend for haemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

111.      The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.  Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

112.      The IARC Working Group further found that glyphosate and glyphosate formulations induce DNA and chromosomal damage to mammals, and in human and animal cells in utero.

113.      The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.

114.    Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

115.    The IARC Working Group also reviewed the Agricultural Health Study, consisting of prospective cohort of 57,311 licensed pesticide applicators in Iowa.

K.    *Evidence of Carcinogenicity found in Roundup®*

116.    As early as the 1980s, a group of the EPA's toxicology branch published a memorandum classifying glyphosate as a Category C Oncogene.[15]  Category C oncogenes are possible human carcinogens with limited evidence of carcinogenetic.

117.    In 1986, the EPA issued a registration standard for glyphosate (NTIS PB87-103214).  The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies.  All of the data required was submitted and reviewed and/or waived.[16]

118.    In October 1991, the EPA published a memorandum entitled "Second Peer Review of Glyphosate."   This memorandum changed glyphosate's classification to Group E (Evidence of non-carcinogenicity for humans).  Two peer reviewed committee members did not concur with the conclusions of the committee and one member refused to sign the memorandum.[17]

---

[15] Consensus Review of Glyphosate, Casewell No. 661A, March 4, 1985. United States Environmental Protection Agency.
[16] http://www.epa.gov/oppsrrd/registration/REDs/factsheets/O l 78fact.pdf
[17] Second Peer review of Glyphosate, CAS No: 1071-83-6. October 30, 1991. United States Environmental Protection Agency

119.     In addition to the toxicity of the active molecule, studies as early as 1991 support the hypothesis that glyphosate formulations found in Roundup® products are more dangerous and toxic than glyphosate alone.[18]

120.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the level of CDK1/Cyclin B Activation."

121.     The study found that Roundup® caused delays in the cell cycle of sea urchins while the same concentration of glyphosate alone proved ineffective and did not alter cell cycles.

122.     In 2004, Julie Marc published another study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

123.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell."  Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cells, it was of interest to evaluate the threshold doe of glyphosate affecting cells."[19]

L.     *Glyphosate in the environment and global efforts to control Roundup®/glyphosate.*

124.     Glyphosate is released into the environment as a herbicide for controlling woody and herbaceous weeks on forestry, right-of-way, cropped, and non-cropped sites.  These sites may be around water and wetlands.

125.     It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills.  Since glyphosate is not a listed

---

[18] Martinez et al. 2007; Benachour 2009; Gaspier et al; Peixoto 2005; Marc 2004
[19] Molinari, 2000; Stewart, et al. (2003).

chemical in the Toxic Release Inventory, data on releases during its manufacture and handling are not available.

126.     Occupational lawn and forestry workers (such as the Plaintiff) and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing and cleanup of any products containing glyphosate.  They may also be exposed by touching soil and plants to which glyphosate was applied, as the chemical remains of the plant's surface and has been scientifically shown to be absorbed into the plant.  Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

127.     In 1995, the Northwest Coalition for Alternatives to Pesticides reports that in California, the state with the most comprehensive program for reporting of pesticide-causing illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.

128.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015.  More countries will undoubtedly follow suit as the serious dangers of the use of Roundup® become more widely known.

129.     The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect at the end of 2015.  In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated that "…In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of the product are.  Children are especially sensitive to the toxic substance and should therefore not be exposed to it."

130.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend its use of glyphosate.

131.     Bermuda formally banned both the private and commercial use of glyphosates, including Roundup®.  The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray Roundup® has been suspended."

132.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

M.     *The Defendants perpetuate Monsanto's disregard for public safety.*

133.     MONSANTO's website, which is now owned by the Defendants pursuant to the Acquisition, continues to contain press releases and other publications that touts the safety of Roundup® and glyphosate products.

134.     Ironically, MONSANTO's website cites several sources as "proof" of the safety of glyphosate, including a May 16, 2016 Summary Report of the Joint FAO/WHO meeting on Pesticide Residues ("Summary Report").[20]

135.     The WHO, by and through IARC, is the same organization that now considers glyphosate to be a probable carcinogen.

136.     MONSANTO implies the Summary Report supports glyphosate is not harmful, no doubt relying on the Summary Report having "concluded that glyphosate is unlikely to be genotoxic at anticipated dietary exposures."

---

[20] Available at http://who.int/foodsafety/jmprsummary2016.pdf?ua=1

137.     That narrow focus misses the mark and complete mischaracterized the Summary Report.  In fact, the Summary Report initially reflects that "…there is some evidence of a positive association between glyphosate exposure and risk of NHL from the case-control studies and the overall meta-analysis."

138.     Furthermore, the Defendants' website uses the Summary Report to support a general contention that exposure to glyphosate is safe.  However, this reliance on the Summary Report ignores the critical fact that the focus of the underlying study was **anticipated dietary exposures** which may result from eating food containing glyphosate residues.

139.     People such as the Decedent do not profess to developing NHL or other forms of cancer as a result of eating contaminated food.  Rather, their exposure resulted from directly handling glyphosate-containing products such as Roundup® in the performance of their jobs.

140.     In the case of the Decedent, he:

    a.  Regularly sprayed Roundup® on customers' lawns and/or landscaping, as well as his own personal lawn and landscaping at his Florida home;

    b.  Regularly inhaled the corresponding mist from the Roundup® as he sprayed Roundup® on customers' lawns and/or landscaping, as well as on his own personal lawn and landscaping at his Florida home;

    c.  Regularly dripped Roundup® on his skin while spraying the Roundup® on customers' lawns and/or landscaping, as well as on his personal lawn and landscaping at his Florida home; and

    d.  Regularly dripped Roundup® on his clothes, which he wore throughout the day.

141.     The Decedent's exposure thus occurred daily, multiple times a day, over the course of many years, and was by way of inhalation into his lungs as well as direct absorption into his skin.

142.     Dietary exposure was not part of the problem.

143.     Glyphosate, and Roundup® products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

144.     The Defendants' statements proclaiming the safety of Roundup® and disregarding its dangers misled Plaintiff.

145.     Despite the Defendants' knowledge that Roundup® was associated with the elevated risk of developing cancer, the Defendants' promotional campaigns focused on Roundup®'s purported "safety profile."

146.     The Defendants' failure to adequately warn the Decedent resulted in (1) his use of and exposure to glyphosate instead of using another acceptable and safe method of controlling unwanted weeks; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup®.

147.     The Defendants failed to seek modification of the labeling of Roundup® to include relevant information regarding the risks and dangers associated with Roundup® exposure.

148.     The failure of the Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

149.     The failure of the Defendants to appropriately warn the EPA has resulted in the absence of warning or caution statements that are adequate to protect human health and the environment.

150.     The failure of the Defendants to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect human health and the environment.

151.     By reason of the foregoing acts and omissions, Plaintiff seeks compensatory and punitive damages as a result of the Decedent's use and exposure to Roundup®, which caused or was substantial in contributing to the Decedent's NHL which lead to the premature death of the Decedent.

152.     The Defendants' acts and omissions have caused Decedent to suffer severe and personal injuries which were permanent and terminal in nature, physical pains, mental anguish, including diminished enjoyment and deprivation of life.

N.     *Equitable Tolling of the Applicable Statute of Limitations*

153.     The running of any statute of limitations has been tolled by reason of the Defendants' fraudulent concealment.     Defendants, through their affirmative misrepresentations and omissions, actively concealed from Decedent the true risks associated with Roundup® glyphosate.

154.     At all times relevant to this lawsuit, the Defendants have maintained that Roundup® is a safe, non-toxic, and non-carcinogenic product.

155.     As of August 2019, the Defendants continue to represent to the public that 'regulatory authorities and independent experts around the world have reviewed numerous long-term carcinogenic properties and genotoxicity studies and agree that there is not

evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, cause cancer, even at very high does, and that it is not genotoxic."[21]

156.     As a result of Defendants' actions, Decedent was unaware, and could not have reasonably known or have learned through reasonably diligence that Roundup® and/or glyphosate contact exposed Decedent to the risks alleged herein, and that those risks were the direct and proximate cause of the Defendants' acts and/or omissions.

157.     The Defendants are estopped from relying on any statute of limitations due to their fraudulent concealment of the true character, quality, and nature of Roundup®.

158.     The Defendants were under a duty to disclose the true character, quality, and nature of Roundup® because this was non-public information over which Defendants had and continue to have exclusive control, and because the Defendants knew that this information was not available to the Decedent and/or the distributors of Roundup®.

159.     In addition, the Defendants are estopped from relying on any statute of limitations due to their intentional and active concealment of the facts surrounding Roundup® and its true character, quality, and nature.

160.     Decedent had no knowledge that the Defendants were engaged in the wrongdoing alleged herein.

161.     Due to the fraudulent acts of concealment or wrongdoing by the Defendants, the Decedent could not have reasonably discovered the wrongdoing at any time prior.

162.     In addition to active concealment and wrongdoing by the Defendants, the Court should consider the financial / economic component in this matter.   Specifically,

---

[21] Backgrounder-Glyphosate: No Evidence of Carcinogenicity. Updated November 2014.

Decedent's medical professionals could not have afforded and could not have possibly conducted the studies necessary to determine the nature, extend, and identity of related health risks, and were forced to rely on only the Defendants' representations as to the safety of Roundup®.

163.     Accordingly, the Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

*O.     Wrongful Death Claim*

164.     Section 768.30, Fla. Stat. (2019), states as follows:

> The action shall be brought by the **decedent's personal representative**, who shall recover for the benefit of the **decedent's survivors and estate** all damages, as specified in this act, caused by the injury resulting in death.

165.     Plaintiff is the duly appointed personal representative of the Estate of THOMAS J. CAHILL III, the Decedent.  As such, Plaintiff has standing and authority to bring this action against the Defendants.

166.     Section 768.21, Fla. Stat. (2019) states that the potential beneficiaries of an action for wrongful death "…shall be identified in the complaint and their relationship to the decedent shall be alleged."  In compliance with this requirement of Florida's Wrongful Death Act, upon current information and belief of the Plaintiff, the potential beneficiaries are as follows:

| NAME | RELATIONSHIP | DOB |
|------|-------------|-----|
| DOROTHY F. ANDERSON-CAHILL | Spouse | (adult) |
| HEATHER K. | Daughter | (adult) |

| SMOLLETT | | |
| --- | --- | --- |
| CAROLYN A. MCDONALD | Daughter | (adult) |
| MATTHEW T. CAHILL | Son | (adult) |
| THOMAS J. CAHILL, IV | Son | (adult) |

167.     As a result of the acts and/or omissions by the Defendants, the individuals listed above in Paragraph 166 have suffered loss of companionship, loss of protection, mental pain and suffering, support and services provided by the Decedent, medical and funeral expenses, loss of earnings of the deceased, loss of prospective net accumulations of the Decedent's estate, and all applicable interest thereon allowable by law.

168.     All conditions precedent to bringing this action have occurred, have been satisfied, and/or have been otherwise waived.

## COUNT I – NEGLIGENCE – WRONGFUL DEATH

Plaintiff hereby adopts and re-alleges the allegations set forth in Paragraphs 1-168 above as though fully and expressly set forth herein and further allege as follows:

169.     Defendants caused, directly or indirectly, Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Decedent.

170.     Defendants had a duty to exercise reasonable case in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, quality assurance, quality control, and/or distribution of Roundup® into the stream of commerce, including the duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

171.     The Defendants failed to exercise reasonable case in  designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, quality assurance, quality control, and/or distribution of Roundup® into interstate commerce in that Defendants knew or should have known that using Roundup® created a high risk of unreasonable, dangerous side effects, including but not limited to the development of NHL and other cancers, as well as other severe and personal injuries which are permanent and lasting in nature, physician pain and mental anguish, including the diminished enjoyment and deprivation of life, as well as need for lifelong medical treatment, monitoring, medications, and ultimately death.

172.     The negligence by the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

    a.  Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup®;

    b.  Failing to test Roundup® and/or failing to adequately, sufficiently, and properly test Roundup®;

    c.  Not conducting sufficient testing programs to determine whether or not Roundup® was safe for use; in that Defendants knew or should have known that Roundup® was unsafe and unfit for use by reason of the dangers to its users;

d.  Not conducting sufficient testing programs and studies to determine Roundup®'s carcinogenic properties, even after Defendants had knowledge that Roundup® is, was, or could be carcinogenic;

e.  Failing to conduct sufficient testing to determine the safety of 'inert' ingredients and/or adjuvants contained in Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not 'inter' ingredients and/or adjuvants were safe for use;

f.  Negligently failing to adequately and correctly warn the Decedent, the medical and agricultural professionals, and the EPA of the dangers of Roundup®;

g.  Negligently failing to petition the EPA to strengthen the warning associated with Roundup®;

h.  Failing to provide adequate cautions and warning to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup®;

i.  Negligently marketing, advertising, and recommending the use of Roundup® without sufficient knowledge as to the dangerous propensities of said product;

j.  Negligently representing that Roundup® was safe for use for its intended purpose, and/or that Roundup® was safe than ordinary and common items such as table salt when, in fact, it was very unsafe;

k.  Negligently representing that Roundup® had equivalent safety and efficacy as other forms of herbicides;

l.  Negligently designing, advertising, manufacturing, producing, and formulating Roundup® in a manner which was dangerous to all users;

m.  Concealing information from the Decedent while knowing that Roundup® was unsafe, dangerous, and/or non-conforming to EPA regulations;

n.  Improperly concealing from and/or misrepresenting information to the Decedent, the scientific and medical professionals, and/or the EPA concerning the severity of the risks and dangers of Roundup® compared to other forms of herbicides; and

o.  Negligently selling Roundup® with a false and misleading label.

173.  The Defendants have under-reported, underestimated, and downplayed the safety risks and/or dangers of Roundup® with common everyday foods such as table salt and other forms of herbicides.

174.  The Defendants were negligent in and/or violated Florida law in designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marking, and selling Roundup® in that they:

a.  Failed to use ordinary care in designing and manufacturing Roundup® so as to avoid the aforementioned risks to individuals when Roundup® was used as a herbicide;

b.  Failed to accompany its product with property and/or accurate warnings regarding the possible adverse side effects associated with the use of and contact with Roundup®;

c.  Failed to accompany its products with property warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup®;

    d.   Failed to warn Decedent of the severity and the duration of such side effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects, including but not limited to the development of NHL and other cancers.

    e.   Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup®;

    f.   Negligently misrepresented the evidence regarding the scientific evidence showing Roundup®'s genotoxicity and carcinogenicity; and

    g.   Were otherwise careless and/or negligent.

175.    Despite the fact that the Defendants knew or should have known that NHL would or could be caused by the use of Roundup® or Defendants' related products, the Defendants continued to market, manufacture, distribute, and sell said products.

176.    The Defendants knew or should have known that consumers and potential handlers, such as Decedent, would foreseeably suffer injury as a result of the Defendants' failure to exercise ordinary case as set forth above.

177.    The Defendants' violations of law and/or negligence were the proximate cause of Decedent's injuries, harm, economic loss, and untimely death.

178.    As a result of the foregoing acts and/or omissions by the Defendants, the Decedent developed NHL, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain, mental anguish, diminished enjoyment of list, and financial expenses for hospitalization and treatment.

179.    Furthermore, the Decedent prematurely died as a direct result of the NHL.

WHEREFORE, the Plaintiff respectfully demands that this Honorable Court enter judgment against the Defendants for an amount in excess of $75,000.00 plus costs, interest, and reasonable attorney's fees allowable by law, as well as such other relief as this Honorable Court deems just and proper.

## COUNT II: STRICT LIABILITY – DESIGN DEFECT – WRONGFUL DEATH

Plaintiff hereby adopts and re-alleges the allegations set forth in Paragraphs 1-168 above as though fully and expressly set forth herein and further allege as follows:

180.    At all times material hereto, the Defendants directly or indirectly by virtue of the Acquisition designed, researched, manufactures, tested, advertised, promotes, sold, distributed Roundup® and the related glyphosate-based products.

181.    The Defendants designed, researched, manufactures, tested, advertised, promotes, sold, distributed Roundup®, which was expected to and did reach the usual consumer, handlers, and persons coming into contact with said product without substantial change in the condition in which it was products, manufactures, sold, distributed, and marketed by the Defendants.

182.    At all times material hereto, Roundup® was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, including the Decedent.

183.    At all times material hereto, Roundup® was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefit associated with the design or formulation of Roundup®.

184.     At all times material hereto, Roundup® was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, it was unreasonably dangerous for normal use, and it was more dangerous than an ordinary consumer would expect.

185.     At all times material hereto, Roundup® was in defective condition and unsafe, and the Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner provided by the Defendants.  In particular, Roundup® was defective in the following ways:

   a.  When placed in the stream of commerce, Roundup® products were defective in design and formulation, and consequently, dangerous to an extent beyond which an ordinary consumer would anticipate;

   b.  When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of NHL, other cancers, and other serious illnesses when used in a reasonably anticipated manner;

   c.  When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonable manner;

   d.  The Defendants did not sufficiently test, investigate, or study its Roundup® products;

   e.  Exposure to Roundup® products presents a risk of harmful side effect that outweigh any potential utility stemming from the use of herbicides;

     f.   The Defendants knew or should have known at the time of marketing that exposure to Roundup® products could result in cancer or other severe illnesses and injuries; and

     g.   The Defendants did not conduct adequate post-marketing surveillance of their Roundup® products.

186.    At all times material hereto, the Defendants knew or should have known that Roundup® products were in a defective condition and were inherently dangerous and unsafe.

187.    Decedent was exposed to the Roundup® products, as described above, without knowledge of the dangerous characteristics of said products.

188.    At the time of Decedent's exposure to the Roundup® products, the products were being used for the purpose and in the manner normally intended, as a broad-spectrum herbicide.

189.    The Defendants voluntarily designed their Roundup® products, with knowledge of its unreasonably dangerous risks, to be used by the public, including the Decedent.

190.    The Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

191.    The Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

192.    The Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the marketing and promotional materials and information downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

193.     The Roundup® products were manufactured defectively in that these products left the hands of the Defendants in a defective condition and were unreasonably dangerous for its intended users.  Furthermore, the Roundup® products reached the intended users, including the Decedent, in the same defective and unreasonably dangerous condition.

194.     Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of the consumer, including the Decedent, and the Defendants are therefore strictly liable for the injuries sustained by the Decedent.

195.     The Decedent could not, by the exercise of reasonable case, have discovered or otherwise perceived the defects of Roundup® products referenced herein.

196.     In light of the foregoing, the Defendants are strictly liable to the Decedent for the manufacturing, marketing, promoting, distributing, and selling of the defective Roundup® products.

197.     The defective design of Roundup® products amounts to willful, wanton, and/or reckless conduct by the Defendants.

198.     Defects of the Roundup® products were the direct cause or a substantial factor in the Decedent's development of NHL, other severe and personal injuries, which were permanent and lasting in nature, physical pain, mental anguish, diminished enjoyment of life, financial expenses for hospitalization and treatment, and untimely death.

WHEREFORE, the Plaintiff respectfully demands that this Honorable Court enter judgment against the Defendants for an amount in excess of $75,000.00 plus costs, interest, and reasonable attorney's fees allowable by law, as well as such other relief as this Honorable Court deems just and proper.

COUNT III: STRICT PRODUCTS LIABILITY – FAILURE TO WARN – WRONGFUL

DEATH

Plaintiff hereby adopts and re-alleges the allegations set forth in Paragraphs 1-168 above as though fully and expressly set forth herein and further allege as follows:

199.     Defendant have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup® products, and through that conduct, has knowingly and intentionally placed Roundup® products into the stream of commerce with full knowledge that it reaches consumers, such as Decedent, who are exposed to it through ordinary and reasonably foreseeable uses.

200.     The Defendants did in fact sell, distribute, supply, manufacture, and/or promote Roundup® products to Decedent.  Additionally, the Defendants expected that Roundup® products would reach, and did in fact reach, consumers including Decedent, without any substantial change in the condition of the product from when it was initially distributed by the Defendants.

201.     At the time of manufacturing, the Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup® products and glyphosate-containing products because they know or should have known of the unreasonable high risk of harm associated with the use and/or exposure to such products.

202.     At all times material hereto, the Roundup® products were defective and unsafe such that it was reasonably dangerous to the user at the time it was distributed by the Defendants and at the time Decedent was exposed to the Roundup® product(s).

Defendants were aware of the defective condition of its Roundup® products, and knew or should have known of the unreasonable risk of harm associated with the use and/or exposure to such products.

203.     At all times material hereto, the Roundup® products were defective and unsafe such that they were reasonably dangerous to the user, and were so at the time said products were distributed by the Defendants and at the time the Decedent was exposed to the Roundup® products.

204.     Roundup® did not contain any warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. 136, as well as the laws of the State of Florida.

205.     Defendants could have amended the label of Roundup® to provide additional warnings, but refused to do so.

206.     This defect cause serious injury to the Decedent, who used Roundup® in the intended and foreseeable manner.

207.     At all times material hereto, the Defendants had a duty to property design, manufacture, test, inspect, package, label, distribute, market, examine, maintain, supply, provide proper warnings, and take such steps necessary to ensure that the product did not cause users to suffer form unreasonable and dangerous side effects.

208.     The Defendants labeled, distributed, and promoted the Roundup® products which were dangerous and unsafe for the use and purpose in which each was intended.

209.     The Defendants failed to warn of the nature and scope of the side-effects associated with Roundup® products, including but not limited to its carcinogenic properties and its

propensity to cause or serve as a substantial contributing factor in the development of NHL and other cancers.

210.     The Defendants were aware of the probable consequences of the use and contact with the aforesaid Roundup® products.

211.     The Defendants failed to exercise reasonable case in warning of the dangerous carcinogenic properties and side effects such as developing NHL and other cancers from Roundup® exposure, even though the side effects were known or reasonably scientifically knowable at the time of distribution.  The Defendants willfully and deliberately failed to warn the consumer, including Decedent of the consequences and side effects of exposure to Roundup®.

212.     At the time of his exposure, the Decedent could not have reasonably discovered any defect in Roundup® through the exercise of reasonable care.

213.     The Defendants manufactured and distributed the Roundup®, and therefore held the level of knowledge of an expert in the field.

214.     Decedent relied upon the skill, superior knowledge, and judgment of the Defendants.

215.     Had Defendants properly disclosed the risks associated with the Roundup® products, Decedent would have avoided their use and, therefore, avoided the development of NHL.

216.     The information that the Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Decedent to utilize the Roundup® products safely and with adequate protection.

217.     Rather, the Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate the severity, duration, and extent of the risk of injuries associated with use and/or exposure to Roundup® products and other glyphosate-based products; continued to promote the efficacy and safety of Roundup®, even after it knew or should have known of the reasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate-based products.

218.     To this date, Defendants have failed to adequately warn of the risks of Decedent's injuries associated with the use of and exposure to Roundup®.

219.     As a result of their inadequate warnings, the Defendants' Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of the Defendants, were distributed by them, and used by the Decedent.

220.     As a direct and proximate result of the Defendants' acts and/or omissions as alleged herein, and in such other ways to be later shown, the Roundup® products caused the Decedent's development of NHL, other severe and personal injuries which were permanent and lasting in nature, physical pain, mental anguish, diminished enjoyment of life, financial expenses for hospitalization and treatment, and untimely death.

WHEREFORE, the Plaintiff respectfully demands that this Honorable Court enter judgment against the Defendants for an amount in excess of $75,000.00 plus costs, interest, and reasonable attorney's fees allowable by law, as well as such other relief as this Honorable Court deems just and proper.

COUNT IV: BREACH OF IMPLIED WARRANTY – WRONGFUL DEATH

Plaintiff hereby adopts and re-alleges the allegations set forth in Paragraphs 1-168 above as though fully and expressly set forth herein and further allege as follows:

221.    At all times material hereto, the Defendants designed, researched, manufactures, tested, advertised, promotes, sold, and distributed Roundup®.

222.    At all times material hereto, the Defendants knew of Roundup®'s intended use and impliedly warranted the product to be of merchantable quality and safe and fit for its use.

223.    The Defendants impliedly represented and warranted to consumers, including the Decedent, as well as to the agricultural community and the EPA, that Roundup® was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

224.    These representations and warranties were false, misleading, and inaccurate in that Roundup® was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

225.    Decedent and the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

226.    Decedent reasonably relied upon the skill and judgment of the Defendants as to whether Roundup® was of merchantable quality and safe and fit for its intended use.

227.    Roundup® was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition, and Roundup®'s materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

228.     The Defendants breached the aforesaid implied warranties, in that Roundup® products were not fit for their intended purpose and uses.

229.     As a result of the foregoing acts and omissions of the Defendants, the Decedent suffered from NHL, other severe and personal injuries which were permanent and lasting in nature, physical pain, mental anguish, diminished enjoyment of life, financial expenses for hospitalization and treatment, and an untimely death.

WHEREFORE, the Plaintiff respectfully demands that this Honorable Court enter judgment against the Defendants for an amount in excess of $75,000.00 plus costs, interest, and reasonable attorney's fees allowable by law, as well as such other relief as this Honorable Court deems just and proper.

## DEMAND FOR JURY TRIAL

WHEREFORE, the Plaintiff, DOROTHY ANDERSON-CAHILL, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF THOMAS J. CAHILL III, demands a trial by jury of all issues so triable as a matter of right and reserves the right to amend this Complaint to seek punitive damages.

Dated this _____ day of August, 2019

Respectfully submitted,

\s\ <u>Nicolas Lampariello</u>
Nicolas Lampariello, Esq.
Florida Bar No., 107722
Lead Counsel for Plaintiff
Email: pleadings@lawllg.com
       nic@lawllg.com


\s\ <u>Joshua Christensen</u>
Joshua Christensen, Esq.
Florida Bar No., 115701
Counsel for Plaintiff
Email: pleadings@lawllg.com
       josh@lawllg.com


LAMPARIELLO LAW GROUP LLP
4760 W. Commercial Blvd.
Tamarac, FL 33319
Tel. (954) 628-3579
Fax: (954) 343-8712